## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BIOTECHNOLOGY INDUSTRY ORGANIZATION, | ) ) ) | Civil Action No. _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| THE DISTRICT OF COLUMBIA, et al., | ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF AMIT SACHDEV

I, Amit Sachdev, declare as follows:

1.      I am the Executive Vice President, Health of the Biotechnology Industry Organization ("BIO"). I have held this position since April 18, 2005.

2.      BIO is a non-profit corporation organized and existing under the laws of the District of Columbia, where it is also headquartered.

3.      BIO is a membership organization. BIO members include the world's leading pharmaceutical and biotechnology research, development, and manufacturing companies, as well as companies that service the biotechnology industry. Among BIO's members are small, emerging companies without approved therapies, as well as multi-national corporations with successful pharmaceuticals and biopharmaceuticals for the diagnosis and treatment of disease.

4.    The biotechnology industry offers benefits to society that were unfathomable only decades ago.  The number of approved biotechnology therapies—treatments developed through cellular and biomolecular processes—has risen from a mere 22 in 1993 to 212 at the end of 2004.  Among these revolutionary biopharmaceuticals are treatments for cancer, stroke, heart attack, diabetes, and countless other life-threatening illnesses.  Biotechnology diagnostics range from home pregnancy tests to devices that can detect the presence of HIV in the blood supply.  In 2004 alone, global investment in biotechnology research and development was $20.8 billion.

5.    BIO's mission is to be the champion of biotechnology and the advocate for its member organizations, both large and small.  It represents its members' interests before all branches of government, and promotes policies that encourage the investments in biomedical innovation that enable our members to develop life-saving and life-improving therapies.  Because of the success BIO has had in advancing the interests of biotechnology, its membership has more than doubled to 1,131 members since its founding in 1993.  BIO promotes policies that encourage predictability in regulatory approval and reimbursement processes, policies that reward innovation through market-based solutions, and policies that enhance patient access to its members' therapies. As part of its commitment to further advancing the achievements of biotechnology, BIO seeks to ensure that its members' therapies can command market-based prices, so that they can compete in the capital markets with other industries, most of which also benefit from market-based pricing.

6.    BIO is authorized by its Board of Directors to bring this suit on behalf of its members.

2

7.    BIO and its members are committed to developing newer and more effective vaccines, antivirals, therapies, diagnostics, and other pharmaceuticals and biopharmaceuticals to improve the health of patients around the world. Moreover, BIO members are dedicated to developing preventive therapies, in addition to traditional remedies, so that disorders can be avoided altogether. Such preventive therapies seek to minimize the need for expensive, lengthy, and often painful remedial therapies. In furtherance of these commitments, many BIO members currently hold, or are in the process of applying for, patents for their therapies. These companies rely on strong protection of their intellectual property rights. As an advocate for its members, BIO strives to ensure that its member manufacturers do not face liability for offering, or for allowing downstream sellers to offer, their therapies for sale in the District of Columbia on the same terms as those offered in all other U.S. states. It is primarily for this reason that BIO challenges the D.C. Prescription Drug Excessive Pricing Act of 2005 ("the D.C. Act"), which caps the prices at which pharmaceutical manufacturers can sell their patented therapies. Moreover, the D.C. Act places unascertainable limits on the prices that pharmaceutical manufacturers can charge for their therapies, as liability depends entirely on the ultimate retail price of the therapy, over which the manufacturer has virtually no direct control.

8.    The overwhelming majority of therapies produced by BIO members are supplied to customers outside the District of Columbia. Such therapies are rarely supplied directly from BIO members to doctors and healthcare institutions in the District. The distribution chain of pharmaceuticals and biopharmaceuticals can be complex and often involves multiple buyers and sellers. The most common purchasers of pharmaceuticals and biopharmaceuticals from the manufacturer are wholesalers, large retail chains, and, in the case of biopharmaceuticals, specialty pharmaceutical distributors equipped to handle the unique storage

and handling requirements of these products. If the initial buyer is a wholesaler, the therapy is often sold to other wholesalers, retail pharmacies, or healthcare institutions. If the initial buyer is a retail chain, the therapy is usually then shipped by the retailer to the company's retail stores. If the initial buyer is a specialty pharmaceutical distributor, the biopharmaceutical may be further distributed or dispensed to a number of health institutions or specialty pharmacies. I am not aware of any case in which the therapy is ultimately dispensed to patients by a manufacturer or wholesaler, rather than through a healthcare institution, retail chain, or specialty pharmacy. The manufacturer of the biopharmaceutical cannot establish the terms at which the therapy is ultimately offered for retail sale. Retailers (and other point of sale dispensers) are free to set their own margins, and decide whether to impose fees, such as dispensing fees. Nor does a wholesaler or retailer act as the manufacturer's agent when selling the therapy to consumers or other institutions.

9.    No member of BIO that develops or produces therapies maintains headquarters or warehouses in the District of Columbia. To the best of my knowledge, none of the wholesalers, retailers, and specialty pharmaceutical distributors to whom BIO members supply the vast majority of their therapies maintains headquarters in the District of Columbia, or warehouses in the District to which BIO members ship their therapies.

10.    Among BIO members and their customers, the price a wholesaler, specialty pharmaceutical distributor, or retail chain pays to a manufacturer is commonly known as the "ex-manufacturer" price. The price at which a wholesaler offers a therapy for sale is usually called the "ex-wholesaler" or "wholesale" price. The price paid by patients is the "retail" price.

11.    The D.C. Act links its definition of "excessive" prices to the "comparable" price in Australia, Canada, Germany, and the United Kingdom. These four countries maintain price control regimes. The United States Congress repeatedly has reviewed proposals to institute price controls and rejected them, recognizing that price controls would stymie the continued development of new and improved therapies.

12.    If a plaintiff can show that the price for a therapy exceeds the limit established by the D.C. Act, the defendant can avoid liability by showing that the price is not "excessive" based on enumerated factors, such as the cost of developing the therapy and the impact the price might have on the therapy's availability to residents of the District. The Act does not define the relative weight to be accorded each factor, nor does it instruct a judge or defendant as to how the factor should be applied to the facts of a particular sale. For these reasons, BIO members would have no method of determining, at the time of initial sale, whether the price they charge might give rise to liability under the D.C. Act.

13.    If the D.C. Act were to take effect, BIO members would be irreparably injured. Individual biopharmaceutical manufacturers would be required to make their own independent judgments as to how to attempt compliance with the D.C. Act. Regardless of what changes a manufacturer makes to its pricing strategy, distribution processes, or other business practices, all of the potential methods by which a BIO member might avoid liability would result in serious detriment.

14.    These losses—which are likely substantial, and hard to quantify—could take any or all of several forms. Although, as noted above, *see supra* ¶ 8, it would be difficult for manufacturers to establish the ultimate retail price of a therapy, manufacturers might adopt

sharply lower prices in an effort to avoid liability under the Act. This, of course, would by itself lead to significant losses. Therefore, even a company attempting to comply with the Act by greatly lowering its prices might still face exposure unless it took significant additional steps to affect the ultimate retail price of a therapy. The resulting cost to a BIO member could be immense and extremely difficult to quantify.

15.    Moreover, because the Act links its definition of "excessive" prices to comparable prices in enumerated foreign countries, individual manufacturers, in the exercise of their independent business judgment, could decide that the only practical method of ensuring compliance would be to withdraw from these foreign markets. Although the cost of that loss is difficult to calculate, it would be substantial for most manufacturers. In addition, if the D.C. Act succeeds in making patented prescription therapies available in the District for significantly lower prices than in other states, consumers from nearby states likely would travel to the District for the sole purpose of purchasing therapies. This would increase by a substantial amount the already significant loss that BIO members would face.

16.    Moreover, whatever actions a BIO member takes, it likely will face a substantial number of lawsuits under the Act. The D.C. Act empowers not only the District itself to enforce the Act, but also any private litigant "directly or indirectly affected by excessive prices." Because the price control mechanism of the D.C. Act does not permit manufacturers to know whether they will ultimately face liability, regardless of the ex-manufacturer price of the therapy, BIO members are likely to face numerous lawsuits by consumers and organizations that purport to represent them. There is no way to predict the precise number of lawsuits that could result, or the magnitude of the potential liability. However, as there are innumerable sales of patented therapies per year, the costs of defending against such lawsuits could be debilitating.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2005

Amit Sachdev