UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BIOTECHNOLOGY INDUSTRY ORGANIZATION,<br><br>Plaintiff<br><br>v.<br><br>THE DISTRICT OF COLUMBIA,<br><br>ANTHONY A. WILLIAMS, in his official capacity as Mayor of the District of Columbia,<br><br>OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA<br><br>and<br><br>ROBERT J. SPAGNOLETTI, in his official capacity as the Attorney General of the District of Columbia<br><br>Defendants. | Civil Action No. _____<br>Honorable Richard J. Leon |

## DECLARATION OF JIM MEYERS

I, Jim Meyers, declare as follows:

1. I am the Vice President of U.S. Commercial Operations of Gilead Sciences, Inc. ("Gilead"). Since January 2001, I have been responsible for wholesale distribution of Gilead's patented prescription products in the United States. I am knowledgeable about Gilead's distribution system, sales and arrangements with wholesalers and, more specifically, sales of Gilead's prescription products that are ultimately resold in the District of Columbia.

2. Gilead is a corporation organized and existing under the laws of Delaware that maintains its principal place of business in Foster City, California. Gilead is a member of the Biotechnology Industry Organization ("BIO"), the plaintiff in this action.

3. Gilead is a biopharmaceutical company that discovers, develops and commercializes therapeutics to advance the care of patients suffering from life-threatening diseases. Gilead was incorporated in June 1987. Gilead holds patents protecting prescription drugs for nine approved products, including Viread®, Truvada® and Emtriva® for the treatment of HIV infection; Hepsera® for the treatment of chronic hepatitis B; AmBisome® liposome for injection for the treatment of fungal infection; and Vistide® for the treatment of cytomegalovirus retinitis.

4. Gilead does not sell any of its patented prescription products directly into the District of Columbia. All of Gilead's prescription products that are ultimately offered for sale in the District are sold in the District by retail sellers or hospitals that purchased the products from wholesalers to whom Gilead sold the product outside the District. Therefore, none of the transactions to which Gilead is a party that would be covered by the D.C. Prescription Drug Excessive Pricing Act of 2005 ("the D.C. Act") occurs in the District.

5. Gilead does not have its principal place of business, nor any production or warehousing facilities, in the District of Columbia. During the second quarter of 2005, approximately 90% of Gilead's product sales in the United States were to three distributors, AmerisourceBergen Corp., McKesson Corp. and Cardinal Health, Inc. Moreover, none of these three wholesalers has headquarters or, to my knowledge, any warehouses in the District of Columbia. AmerisourceBergen Corp., McKesson Corp. and Cardinal Health, Inc., are

headquartered in Dublin, Ohio; Chesterbrook, Pennsylvania; and San Francisco, California, respectively. Nor do these wholesalers receive shipments of product from Gilead in the District.

6. If Gilead were required to comply with the terms of the D.C Act, its national pricing structures would be severely disrupted. Because the wholesalers to which Gilead sells its products do not act on behalf of Gilead when they resell those products, Gilead does not control the terms of such sales and, therefore lacks the ability to dictate where particular shipments of products to wholesalers are ultimately offered for retail sale. Therefore, under the D.C. Act, Gilead would be required to adjust not only the prices of products to be offered for sale in the District (as such products are unidentifiable at the time of sale by Gilead ), but the prices of all patented prescription products.

7. Moreover, Gilead is not able to limit the price a wholesaler that buys its products can charge upon resale. Therefore, Gilead would be unable to know with certainty what ex-manufacturer price would be sufficient to shield it from liability under the D.C. Act.

8. In short, were the D.C. Act to take effect, Gilead would not know how to fully comply with the law. Because the D.C. Act defines "excessive price" with reference to comparable prices in Australia, Canada, Germany and the United Kingdom, each a country in which certain of Gilead's products are offered for sale, Gilead would be required to reconsider its pricing scheme both domestically and abroad.

9. For these reasons, there would be a substantial risk that Gilead would be injured were the D.C. Act to take effect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2005

_____
Jim Meyers