UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-2015 (RJL) |
| THE DISTRICT OF COLUMBIA, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |
| BIOTECHNOLOGY INDUSTRY ORGANIZATION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-2106 (RJL) |
| THE DISTRICT OF COLUMBIA, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The defendants herein (collectively, "the District"), by and through undersigned counsel pursuant to LCvR 65.1(c), hereby submit this Supplemental Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction, in light of persuasive case law that has emerged since the filing of the District's opposition.

On November 8, 2005, the United States Court of Appeals for the First Circuit, in *Pharmaceutical Care Management Assn. v. Rowe*, No. 05-1606 (1st Cir.), affirmed the trial

court's decision granting summary judgment to defendant on all claims in *PCMA v. Maine Atty. Gen'l*, No. 03-cv-153 (D. Me. Apr. 13, 2005).

A copy of the First Circuit's decision is attached hereto, and because the analysis is so compelling, the District here quotes that decision in considerable detail.

The District avers that the *Rowe* decision's discussion of the Commerce Clause is persuasive precedent for rejecting plaintiffs' similar arguments in the instant matter, both directly, and because it analyzed much (if not all) of the controlling precedent cited by the parties here in their Commerce Clause discussion.

The essence of the Commerce Clause argument made by plaintiff in *Rowe* was that a Maine law, either through its "extraterritorial reach" or by excessively burdening interstate commerce, violated the Constitution. *Rowe, slip op.* at 6. The Maine law regulated pharmacy benefit managers ("PBMs"), entities which "serve as intermediaries" between pharmaceutical manufacturers and pharmacies and health benefit providers (such as insurers, health maintenance organizations, etc.), facilitating the provision of prescription drug benefits. *Id*. at 3.

> The [Maine law] imposes a number of requirements on those PBMs that choose to enter into contracts in Maine with "covered entities" -- meaning health benefit providers and including, in part, insurance companies, the state Medicaid program, and employer health plans. Such PBMs are required to act as fiduciaries for their clients and adhere to certain specific duties. For example, they must disclose conflicts of interest, disgorge profits from self-dealing, and disclose to the covered entities certain of their financial arrangements with third parties.

*Id*. at 5 (*citing* Me. Rev. Stat. Ann. tit. 22, §§ 2699(2)(A-G) (2005)).

The PCMA argued that the Maine law had an impermissible "extraterritorial reach" in that if a PBM operating outside of Maine entered into a contract outside Maine with an insurer

operating outside Maine (but licensed in Maine), the PBM would have to comply with the Maine law. *Id*. at 34–35.[1]

---

[1]   PCMA also argued, in the alternative, that the Maine law violated the Commerce Clause under the "more lenient" balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Rowe, supra*, at 36. The First Circuit rejected that argument as well:

> [T]he putative local benefits of the [Maine law] are clear. The aim of the [Maine law] is to reduce the costs of, and increase the public's access to, prescription drugs. The law was designed to deal with "one of the serious problems of our time." [*PhRMA*, 249 F.3d at 80]. PCMA, for its part, thinks these benefits are not likely to materialize as a result of the [Maine law]. It is not the place of this court, however, to pass judgment on the wisdom of the policies adopted by the Maine legislature. *See Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 679 (1981) (Brennan, J., concurring) (stating that courts should refrain from attempting to "second-guess the empirical judgments of lawmakers concerning the utility of legislation"). Furthermore, as the district court points out, under *Pike*, it is the *putative* local benefits that matter. It matters not whether these benefits actually come into being at the end of the day.
>
> On the "burden" side of the Pike balancing equation, PCMA only asserts that as a result of the [Maine law], certain PBMs will no longer do business in Maine. PCMA states that "the extraordinary restrictions imposed [by the Maine law] on the business operations of pharmacy benefit managers (PBMs) will make it virtually impossible to establish or maintain a prescription drug program that relies on a for-profit PBM for administrative services." In [*PhRMA*], we said that "[a]rguably, the only burden imposed on interstate commerce by the . . . Act [in that case] is its possible effects on the profits of the individual manufacturers." [*PhRMA*, 249 F.3d] at 84. We think the same to be true here. However, as we noted in [*PhRMA*], such a burden is not violative of the Commerce Clause because the Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id*. (*quoting Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–28 (1978)).

*Id*. at 36–38 (emphasis in original) (additional citations omitted).

Here, in contrast, plaintiffs have not explicitly argued under *Pike* that the D.C. Act unreasonably burdens interstate commerce, basing their claims solely on the alleged "extraterritorial effect" of the law. Notwithstanding this, the D.C. Act comfortably withstands the *Pike* balancing test, as the benefits of the law—increasing public access to prescription drugs— outweigh the alleged burden, *i.e.*, the law's possible effects on the profits of the manufacturers. *Id*.

The First Circuit rejected that argument in forceful fashion:

> There is a key difference between the [Maine law] and the laws in [*Edgar v. MITE Corp.*, 457 U.S. 624 (1982)] and [*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573 (1986)]. In *Edgar* and *Brown-Forman*, the state laws at issue gave the state power to determine whether a transaction in another state could occur at all. For example, the law in *Edgar* gave the Illinois Secretary of State power to determine whether to allow a tender offer by a Delaware corporation for stock held by an Arkansas resident. Similarly, the New York law in *Brown-Forman* gave the New York State Liquor Authority power to determine whether a liquor distiller or producer would be permitted to reduce its price in other states. It was this sort of "extraterritorial reach" that led the Court to invalidate the statutes at issue in those cases.
>
> The [Maine law], however, does not give Maine any such authority. Under the [Maine law], a transaction outside of Maine between two parties—for example, between PCMA's hypothetical out-of-state PBM and insurance company—can take place regardless of whether Maine consents or not. Maine law does not "regulate . . . [the] out-of-state transaction, either by its express terms or by its inevitable effect." [*PhRMA v. Concannon*, 249 F.3d 66, 81 (1st Cir. 2001)]. Maine does not dictate the terms of such a transaction. Nor is Maine in any way "project[ing] its legislation" into those other states. *Baldwin v. G.A.F. Seelig*, Inc., 294 U.S. 511, 521 (1935). It simply requires that PBMs, should they choose to do business within Maine, provide "covered entities" with certain information about their business relationships. In other words, the [Maine law] does not require out-of-state commerce to be conducted according to in-state terms. It requires only that in-state commerce be conducted according to in-state terms. In light of this distinction, we think that the [Maine law] cannot properly be said to have an extraterritorial reach violating the Commerce Clause.

*Id*. at 35–36 (additional citations omitted).

Identically here, PhRMA argues that the D.C. Act has an impermissible "extraterritorial effect" because it is a "naked attempt to regulate prices of out-of-jurisdiction sales and to punish market participants for economic conduct occurring wholly outside D.C." P.Mem. at 25. Plaintiffs' description of the reach of the D.C. Act is incorrect for the same reasons the *Rowe* plaintiff was incorrect in its description of the Maine law.

Here, a transaction outside the District (say, between a pharmaceutical manufacturer and wholesaler) can take place regardless of whether the District consents or not. The District does

not dictate the terms of such a transaction, nor is the District in any way "project[ing] its legislation" into those other states. *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935). The D.C. Act simply requires that certain entities (manufacturers and wholesalers of pharmaceuticals), should they choose to do business with residents of the District, conduct that transaction according to District law. In other words, the D.C. Act does not require out-of-state commerce to be conducted according to in-state terms. It requires only that in-District commerce be conducted according to in-District terms.

To the extent that the D.C. Act can even be read to have the broad "extraterritorial effect" feared by plaintiffs, it should not be. *See, e.g., K-S Pharmacies, Inc. v. American Home Prod. Corp.*, 962 F.2d 728 (7th Cir. 1992). In that case, a Wisconsin law required drug sellers to sell to Wisconsin purchasers at the same terms available to "the most favored purchaser . . . ." *Id*. at 729. A drug seller, accused of violating the statute, argued that the law violated the Commerce Clause "because charging a particular price in Wisconsin constrains its actions in Alaska." *Id*. at 730. The Seventh Circuit upheld the trial court's denial of the seller's motion to dismiss, finding that, even though the statute did not specifically limit its "most favored purchaser" reach to Wisconsin, it should be read that way:

> One staple in the interpretation of federal law is that statutes presumptively govern only conduct in the United States. *E.g., EEOC v. Arabian American Oil Co*., 499 U.S. 244, 111 S.Ct. 1227, 1230 (1991) (collecting cases). Congress has the power to cast its net more widely but must say so. *States lack any comparable power to reach outside their borders, making the presumption of exclusive domestic application even stronger*.
>
> What sense would it make to read a state law to affect out-of-state prices, when the upshot is invalidity?

*Id*. (emphasis added). *See also United States v. Delgado-Garcia*, 374 F.3d 1337, 1344 (D.C. Cir. 2004) (there is a "presumption against reading statutes to have extraterritorial effect. [T]his presumption embodies sensible contextual linguistic reasons for reading the plain texts of domestic statutes not to apply everywhere in the world.") (*citing, inter alia, Arabian American*

*Oil*); *Cf. Shekoyan v. Sibley Int'l*, 409 F.3d 414, 420 (D.C. Cir. 2005) ("If the statutory language is 'ambiguous' or 'does not speak directly to the question presented,' the Court will not infer extraterritorial jurisdiction.") (*quoting Arabian American Oil*, 499 U.S. at 250).

Similarly here, to the extent the D.C. Act *may* be read to "project" itself outside the District, it is obvious that the District "lack[s] the power to reach outside [its] borders," and that the D.C. Act only applies to protect District consumers, and should be read that way.

In light of the above, the District again respectfully requests that the Court deny plaintiffs' motions.

DATE: November 14, 2005                Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General, D.C.

GEORGE C. VALENTINE
Deputy Attorney General, D.C.
Civil Litigation Division

      /s/ Robert Utiger
ROBERT UTIGER, D.C. Bar No. 437130
Senior Assistant Attorney General
Civil Litigation Division
Office of the Attorney General for the District of Columbia
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6532
Facsimile: (202) 727-3625
robert.utiger@dc.gov


      /s/ Richard S. Love
RICHARD S. LOVE, D.C. Bar No. 340455
Chief, Equity I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6635
Facsimile: (202) 727-0431
richard.love@dc.gov

       /s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity 1
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 727-0431
andy.saindon@dc.gov